[Cite as *Woyt v. Woyt*, 2019-Ohio-3758.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ELIA A. WOYT,                                  :

     Plaintiff-Appellee,               :           Nos. 107312, 107321, and 107322

     v.                                :

LAURA M. WOYT,                                 :

     Defendant-Appellant.              :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** September 19, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-16-360863

---

### *Appearances:*

Kvale Antonelli & Raj, and Craig P. Kvale, *for appellee.*

Stafford Law Co., L.P.A., Joseph G. Stafford, and Nicole A.
Cruz, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Plaintiff-appellee Elia Woyt filed a complaint for divorce in the Domestic Relations Division of the Cuyahoga County Court of Common Pleas to terminate his marriage with defendant-appellant Laura Woyt. As relevant to this

appeal, the court's judgment entry allocated parenting time, divided property, ordered spousal and child support, awarded attorney fees and sealed the entire record of the case. Laura now appeals, and in her nine assignments of error challenges the terms of that judgment entry. For the reasons that follow, we affirm in part, reverse in part and remand.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

{¶ 2}    The following was adduced at trial: in 2004, approximately four years before they were married, Elia purchased a house with a cash down payment, financing the remainder with a mortgage. This house became the marital residence and Elia has continued to reside there following the divorce.

{¶ 3}    Elia and Laura were married on May 17, 2008 and have two children, who were ages 8 and 6 at the commencement of trial. For 14 years prior to the marriage, Laura worked in advertising and she continued to so work until their first child was born in early 2009. She has not been employed since that time. Elia is an attorney. During the course of the marriage he became, and remains, a partner in a law firm.

{¶ 4}    After several years, the marriage deteriorated and Elia filed suit for a divorce.[1] After more than two years of litigation, "[w]ell over" $400,000 in attorney and other associated fees and 15 days of trial, the court granted a divorce. In its

---

[1] As to the duration of the marriage the court observed: "[c]onsidering the totality of the circumstances as presented at trial, and not being persuaded to the contrary, this Court finds that the duration of the marriage, for purposes of property division is from May 17, 2008 to February 21, 2017, the commencement of the final hearing."

judgment entry, the trial court discussed Elia's role in the divorce and found that his conduct during the marriage was harmful to Laura and had a significantly negative impact on the children. The court observed that "[s]eldom is the Court faced with a divorcing family where only one parent is the root cause of pending issues. Here, unfortunately, that is the case." The court further stated that trial was "consumed with testimony exclusively of Elia's irrational, unpredictable and abnormal tirades of anger * * *" and that "[f]actually, neither Laura nor the children did anything to cause Elia's outbursts."

## II. LAW AND ANALYSIS

{¶ 5} In reviewing domestic relations issues, this court employs an abuse of discretion standard. *J.R. v. K.R.*, 8th Dist. Cuyahoga No. 106978, 2019-Ohio-1765, ¶ 8. "An abuse of discretion 'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Turner v. Davis-Turner*, 8th Dist. Cuyahoga No. 106002, 2018-Ohio-2194, ¶ 7, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### A. Allocation of Parental Rights and Responsibilities

### 1. Parenting Time Schedule

{¶ 6} In her first assignment of error, Laura argues that the parenting time schedule is not in the children's best interests and that some of the terms in the order are impermissibly vague. We agree.

{¶ 7} R.C. 3109.04 provides a comprehensive statutory scheme governing the allocation of parental rights and responsibilities and custody matters. Pursuant

to the statutory guidelines, there are two ways for parents to share parental rights. *In re M.S.,* 8th Dist. Cuyahoga No. 99563, 2013-Ohio-4043, ¶ 10-11. Under the first approach, the trial court may allocate parental rights and responsibilities primarily to one of the parents and designate that parent as the residential parent and legal custodian of the child. *Id.* at ¶ 10. If the court chooses this approach, it must provide the nonresidential parent with support provisions and an ability to have continuing contact with the child. R.C. 3109.04(A)(1); *M.S.* at ¶ 10. Under the alternative approach, the parties may request shared parenting which requires the court to conduct an in-depth analysis of the best interests of the child and whether the shared parenting plan conforms to those interests. R.C. 3109.04(F)(1); *M.S.* at ¶ 11.

{¶ 8} In a divorce action where the trial court has not issued a shared parenting decree, R.C. 3109.051(A) generally requires the court to "make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child * * *." R.C. 3109.051(D) requires the court to consider specific factors in making such a determination, including as relevant to this case:

(1) The prior interaction and interrelationships of the child with the child's parents * * *;

(2) The geographical location of the residence of each parent and the distance between those residences * * *;

(3) The child's and parents' available time, including * * * each parent's employment schedule * * *;

* * *

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights * * *; [and]

* * *

(16) Any other factor in the best interest of the child.

{¶ 9}    Based on the evidence of Elia's behavior and its impact on Laura and the children, the court found "the decision regarding allocation of parental rights and responsibilities is an obvious one," and ordered that Laura be the sole residential parent and primary legal custodian of both children with full decision-making authority.  It determined the following parenting time schedule for Elia:

1. **Alternating weekends * * *.**

2. **Weekday visits for two hours if Elia chooses to exercise the same * * *[.]**

3. **Extended weekends due to school holidays are not included at this time.**

4. **No more than one consecutive week (7 days) each summer, and not abutting a regular weekend.**

5. **Holidays according to the Court's standard schedule * * *.**

6. **Extended time during school Winter and Spring breaks, but not an equal division at this time.**

7. **Phone contact at least four (4) times per week.**

{¶ 10} We find that the court abused its discretion pertaining to the parenting time schedule granting Elia "weekday visits" and "extended time."

### a. Weekday Visits

{¶ 11} Under the facts and circumstances in this case, the court's order granting Elia "weekday visits" is inappropriate. The court did not limit the term "weekday" to any specific day or even to a singular day. Instead, the order leaves that determination entirely to Elia and subject to his whim. Although the parties agree that Elia has not yet taken advantage of such visits, the order nevertheless gives him the absolute ability to pick any combination of days or not pick any day at all. Moreover, the order does not require Elia give Laura or the children notice if he elects to avail himself of this visitation on any given weekday.

{¶ 12} Here, such an open-ended term is not in the best interest of the children. It unnecessarily cedes power to Elia, in a relationship dynamic otherwise observed to be unfairly tilted in his favor. As the court recognized, Elia's clear pattern of abuse and disregard towards Laura has negatively impacted the children. The court cited the custody evaluator's opinion that Elia's "coercive manipulation" challenged the children's basic sense of security and attachment to one parent and created "loyalty conflicts." The court further recognized that the children mimic Elia's behavior and "act out toward both Elia and Laura, Laura's parents, and each other." Laura, as the custody evaluator opined, is "a woman who was abused during the course of her marriage * * * [and] is working on this challenging recovery." This visitation term fails to provide stability and certainty for the children and instead merely exacerbates the root imbalance between Elia and Laura.

{¶ 13} Further, allowing Elia a weekday visitation does not make logistical sense. As Elia noted in his brief, he lives 30 miles away from Laura and it takes approximately one hour to get from his place of employment to Laura's home and 45 minutes to go from Laura's house to his own. We reverse the trial court determination as it relates to granting Elia weekday visitation.

**b. Extended Time**

{¶ 14} We further find that the trial court also abused its discretion by granting Elia "extended time during school Winter and Spring breaks, but not an equal division at this time." The court did not define "extended time." It provided no mechanism for the parties to determine what amount of time constitutes "extended" time beyond it not being "an equal division at this time." As we previously stated, in light of Elia's pattern of abuse and disregard toward Laura, such uncertainty relegates too much power to Elia to the detriment of the children. We reverse the trial court's determination as it relates to allowing Elia "extended time."

{¶ 15} We sustain this assignment of error as it relates to "weekday visits" and "extended time."

**2. Continued Enrollment in Case Management Service**

{¶ 16} In her second assignment of error, Laura argues that the court erred by requiring the parties to continue involvement with a forensic case manager. We disagree.

{¶ 17} In its judgment entry the court required at least six months of post-decree participation with a forensic case manager "for the purpose of monitoring the

children's progress in therapy vis-à-vis continued contact with Elia, as well as Elia's continued therapy." The court imposed this requirement in order to facilitate implementation of and adherence to the parenting time schedule.

{¶ 18} Based on the court's observations of Elia and Laura's relationship dynamic and ability to interact as previously discussed, we cannot say that the court abused its discretion in ordering this oversight.

{¶ 19} We overrule this assignment of error.

## B. Property Division

{¶ 20} In her third, fourth and fifth assignments of error, Laura argues that the trial court erred in the division of the parties' property and assets.

{¶ 21} "Marital property" refers to all real and personal property currently owned by one or both spouses that was acquired during the marriage. R.C. 3105.171(A)(3)(a)(i); *Brown v. Brown*, 2014-Ohio-2402, 14 N.E.3d 404, ¶ 24 (8th Dist.). "Separate property" includes all real and personal property acquired by one spouse prior to the marriage. R.C. 3105.171(A)(6)(a)(ii); *Brown* at ¶ 24.

{¶ 22} Commingling separate property with other property does not, on its own, destroy the nature of the separate property. *J.R. v. K.R.*, 8th Dist. Cuyahoga No. 106978, 2019-Ohio-1765, ¶ 37. Separate property remains separate, even when commingled with other property, "'except when the separate property is not traceable.'" *Id.*, quoting R.C. 3105.171(A)(6)(b). "The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of the evidence to trace the asset to separate property." *J.R.* at ¶ 37.

{¶ 23} A trial court's determination of property as either marital or separate is a mixed question of law and fact and this court will not reverse a trial court's determination unless it is against the manifest weight of the evidence. *Brown* at ¶ 23. Once the court characterizes property as marital or separate, we will not disturb the actual distribution of the property absent an abuse of discretion. *Id.*

### 1. Premarital Equity in Marital Residence

{¶ 24} In her third assignment of error, Laura argues that the court erred by finding that Elia established a separate property claim for premarital equity in the home based on "multiple refinances, home equity loans, and payouts received from equity." We find that Elia failed to meet his burden of establishing a separate property claim for premarital equity in the home because he failed to prove that such equity actually existed prior to the marriage.

{¶ 25} The trial court found that Elia established a separate property claim and was entitled to a premarital interest in the amount of cash he paid at closing,[2] based on this court's decision in *Ockunzzi v. Ockunzzi*, 8th Dist. Cuyahoga No. 86785, 2006-Ohio-5741. *See id.* at ¶ 20 (refinancing a home after a marriage, if done for reasons other than purchasing the home "does not in any way" convert separate property into marital property).

{¶ 26} This analysis misses the mark. Before examining whether Elia properly traced any premarital equity in the home in light of subsequent refinancing,

---

[2] The trial court recognized that the home lost value since Elia purchased it and that the parties stipulated to it being worth $295,000 at the time of trial and reduced the amount of the award proportionally.

the trial court should have first determined whether Elia proved that such equity actually existed. *See Kehoe v. Kehoe*, 2012-Ohio-3357, 974 N.E.2d 1229, ¶ 11 (8th Dist.) ("The party seeking to establish an asset or a portion of it as their own separate property has the burden of proof, ordinarily by a preponderance of the evidence, to trace the asset to the separate property source.").

{¶ 27} Here, the relevant question is not whether Elia sufficiently traced premarital equity in the home, but rather what, if any, equity in the home existed at the time of the marriage. It is undisputed that Elia purchased the home prior to the marriage for a price of $303,000, that he paid $44,219.40 in cash at closing, and secured the rest of the purchase price via mortgage. The fact that Elia may have had $44,219.40 in equity at some point in time prior to the marriage does not conclusively establish that he had that amount of equity at the time of the marriage.

{¶ 28} To the contrary, Laura presented evidence calling this into question: Elia added a home equity line of credit secured by the home with a maximum credit of line of $55,000 after he purchased the property but prior to the marriage, thus calling into question the amount of premarital equity that existed at the time of the marriage. The court observed that it "appear[ed]" that the balance of this line of credit was paid off during the marriage. It is thus unclear from the record what equity, if any, Elia had in the home at the time of the marriage. *Compare Ockunzzi*, 8th Dist. Cuyahoga No. 86785, 2006-Ohio-5741, at ¶ 19 (parties agreed about the value of premarital equity in the house).

{¶ 29} As such, attempting to trace Elia's equity in the home before he proves that it existed is essentially putting the cart in front of the horse. We therefore find that the trial court's determination that Elia established a separate property claim for premarital equity in the house was against the manifest weight of the evidence. We sustain this assignment of error.

**2. Elia's Capital Account**

{¶ 30} In her fourth assignment of error, Laura argues that the trial court erred in its terms of distribution of her share of Elia's capital account with his employer. We agree.

{¶ 31} The trial court determined that the Elia's capital account had a value of $132,817.53 as of the date of trial and that the entirety of the account was marital property. Accordingly, the court found that Laura was entitled to $66,409. However, the court ordered that Laura not be immediately compensated with this amount, but instead ordered distribution over an indefinite time and in a piecemeal fashion. It ordered Elia to pay Laura 50 percent of any distribution if, and when, he received it until the total of $66,409 was paid in full.

{¶ 32} R.C. 3105.171 requires a trial court to equitably distribute marital property. *Rodgers v. Rodgers*, 8th Dist. Cuyahoga No. 105095, 2017-Ohio-7886, ¶ 13. Although the trial court found that Laura was entitled to 50 percent of the account, based on the facts and circumstances of this case, the terms of distribution are inequitable and constitute an abuse of discretion.

{¶ 33} According to the terms ordered by the court, whether and when Laura receives her share of the account is determined entirely by Elia's law firm in which he maintains a partnership interest. Further, as the court found, Elia earns $340,000 a year and continues to live in the marital home. Laura, as the court recognized, is at a significant financial disadvantage. She has been unemployed since 2008 and requires training before she can again be employed. Moreover, the court noted that this financial disadvantage has prevented her from relocating from her parents' home.

{¶ 34} In this case there is no reasonable justification for the court to find that Laura's portion of the account be subject to an indefinite term of distribution. We sustain this assignment of error.

### 3. Laura's Retirement Account

{¶ 35} In her fifth assignment of error, Laura argues that the trial court erred in its determination of Elia's interest in her retirement account. She complains that when the court ordered division of the account based on a date that was six days before the wedding, it failed to consider growth attributed to the premarital portion of the account. Elia concedes, and we agree, that the error as to the date is "obviously an oversight that can be easily corrected * * *." As to Laura's claimed error in failing to consider premarital growth of the account, we disagree.

{¶ 36} Here, the trial court found that prior to the marriage, Laura's retirement account had a value of $67,340 and that she therefore had a premarital separate interest in the account as of the date of the marriage. The court stated that

"[n]o evidence of the balance at trial was offered by Laura nor included in the Stipulations provided," and further, "neither party offered evidence upon which this Court can determine Laura's pre-marital versus marital interest" in the account.

{¶ 37} Laura argues that the trial court erred in distributing her retirement account by failing to consider growth attributed to her premarital portion and by using a coverture date that was six days prior to the wedding. However, as the trial court recognized, Laura presented no evidence to demonstrate what the appreciation value would be. *See Johnson v. Johnson*, 6th Dist. Wood Nos. 99-039, 98-082, and 99-057, 2001 Ohio App. LEXIS 461, 14 (Feb. 9, 2001). Accordingly, Laura has failed to demonstrate any error. We overrule this assignment of error. However, we reverse and remand for the trial court to correct the typographical error in its journal entry with respect to the date of the marriage.

### C. Elia's Support Obligations

### 1. Spousal Support

{¶ 38} In her sixth assignment of error, Laura argues that the trial court abused its discretion in its determination of the amount and duration of Elia's spousal support obligation. She argues that trial court's award of $6,500 per month for a period of 30 months is "neither reasonable nor appropriate." We disagree.

{¶ 39} R.C. 3105.18 provides a trial court discretion to award "appropriate and reasonable" spousal support. In making this determination as well in determination of the amount and duration of spousal support, the court must consider the factors listed in R.C. 3105.18(C). *Williams v. Williams*, 8th Dist.

Cuyahoga No. 103975, 2016-Ohio-7487, ¶ 9.  The trial court may also consider any other factor it expressly finds "relevant and equitable."  R.C. 3105.18(C)(1)(n); *id.*

{¶ 40} We will not find an abuse of discretion where the court's order is supported by competent, credible evidence.  *Deacon v. Deacon*, 8th Dist. Cuyahoga No. 91609, 2009-Ohio-2491, ¶ 14.  This court will uphold an award of spousal support so long as the record reflects that the trial court considered the requisite statutory factors, and the judgment contains sufficient detail for us to determine that the award is fair, equitable and in accordance with the law.  *Chattree v. Chattree*, 2014-Ohio-489, 8 N.E.3d 390, ¶ 71 (8th Dist.).

{¶ 41} As a preliminary matter, Laura argues that the court incorrectly used Elia's 2017 projected gross income of $340,000 for purposes of determining the support amount and should have instead used Elia's 2016 approximate gross income of $376,000.  We find that the trial court squarely addressed and disposed of this argument in the judgment entry:

> In her Closing Argument, Laura argues that Elia's income should be $376,000 * * *.  She suggests that Elia's billable hours for 2016 * * * represent "a substantial decrease in his historical billable hours" and that the "chances are overwhelming" that Elia's billable hours and income will "dramatically increase" in 2018 and going forward. * * * In fact, Elia's annual billable hours have steadily *decreased* since 2012 * * *.  Consequently, the Court will not use Laura's higher income figure as the reasons she puts forth are too speculative.
>
> * * *
>
> There was insufficient evidence at the start of trial to conclusively say what Elia's actual compensation would be at the end of 2017 and Elia's attempt to offer this evidence at the close of trial was improper.  Therefore the Court declines to use either Elia's figure of $245,000 or Laura's figure of $376,000.

Giving consideration to all of the financial information admitted and the testimony, the Court finds that Plaintiff's "gross income" for purposes of determining spousal support in this case is $340,000. Because Elia's income has fluctuated in recent years, this figure reasonably represents his average income, and certainly a level of income he can achieve for support purposes.

{¶ 42} Laura claims that 30 months is an insufficient amount of time as she "may not become gainfully employed for at least five (5) years." This speculative estimate is based on Laura's stated desire to change careers and become a teacher and the further education required to do so.

{¶ 43} Nevertheless, the trial court's judgment entry adequately addresses the statutory factors. For example, the court expressly considered that Laura was in good physical health and had no restrictions on her ability to be employed full-time. While the court did indicate that Laura had ongoing mental and emotional issues as a result of her relationship with Elia, it found no indication that this would prevent her from supporting herself. The court considered that Laura has a college degree and further that she has been unemployed since 2009 when they started a family. There was evidence that the last time she was employed, it was in advertising and she earned a salary of $70,911. The court noted there was evidence that Laura's work history was "impressive" and her background was "solid." The court recognized that it would take Laura some time to retrain, but that there was employment available in advertising and that she could expect to earn between $44,000 and $50,000.

{¶ 44} We find no error in the trial court's spousal support order. The record reflects that the court considered the statutory factors and the judgment contains

sufficient detail for us to determine the award is fair, equitable and in accordance with the law. We overrule this assignment of error.

## 2. Child Support

{¶ 45} In her seventh assignment of error Laura argues that the trial court abused its discretion in calculating Elia's child support obligation to be $2,344.17 per month. We agree.

{¶ 46} Pursuant to former R.C. 3119.04,[3] where the parties' combined gross income exceeds $150,000, the trial court must determine the child support amount on a case-by-case basis and in consideration of "the needs and the standard of living of the children who are subject of the child support order and the parents." *N.W. v. M.W.*, 8th Dist. Cuyahoga No. 107503, 2019-Ohio-1775, ¶ 19, quoting R.C. 3119.04(A); *see also Rodgers v. Rodgers*, 8th Dist. Cuyahoga No. 105095, 2017-Ohio-7886, ¶ 52 ("[T]he appropriate standard for the amount of child support [in cases where the combined income exceeds $150,000] is that amount necessary to maintain for the children the standard of living they would have enjoyed had the marriage continued.").

{¶ 47} As this court observed in *J.R. v. K.R.*, 8th Dist. Cuyahoga No. 106978, 2019-Ohio-1765, ¶ 11, former R.C. 3119.04(B) provides:

> If the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, or the child support enforcement agency,

---

[3] We note that R.C. 3119.04 was recently amended, effective March 28, 2019. Former R.C. 3119.04 governs child support calculations where the combined parental income exceeds $150,000. *See J.R. v. K.R.*, 8th Dist. Cuyahoga No. 106978, 2019-Ohio-1765, ¶ 11.

with respect to an administrative child support order, shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents. The court or agency shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court or agency determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount. If the court or agency makes such a determination, it shall enter in the journal the figure, determination, and findings.

{¶ 48} Courts have construed this division to require the trial court to:

(1) set the child support amount based on the qualitative needs and standard of living of the children and parents, (2) ensure that the amount set is not less than the $150,000-equivalent, unless awarding the $150,000-equivalent would be "unjust or inappropriate and would not be in the best interest of the child," and (3) if it decides the $150,000-equivalent is unjust or inappropriate (and awards less), then the court must journalize for that decision.

*Abbey v. Peavy*, 8th Dist. Cuyahoga No. 100893, 2014-Ohio-3921, ¶ 24.

{¶ 49} Laura asserts that the trial court failed to consider the significant disparity in income between herself and Elia. She complains that the court failed to correctly determine the amount of support necessary for the children to maintain the standard of living they would have enjoyed had the marriage continued. Instead, she complains that the court merely ordered Elia to pay child support based upon the child support guidelines.

{¶ 50} The entirety of the court's explanation for its child support determination is as follows:

The Court calculates child support to be $2,344.17 per month, based on Elia's income of $340,000 and Laura's income from spousal support of

$78,000. This amount is an extrapolation beyond the guidelines pursuant to R.C. 3119.04(B), as the combined income of the parties exceeds $150,000.

{¶ 51} A trial court may use the extrapolation method in order to determine the appropriate amount of child support where the parties' combined income is greater than $150,000. *See, e.g., N.W. v. M.W.*, 8th Dist. Cuyahoga No. 107503, 2019-Ohio-1775, at ¶ 25; *but see Siebert v. Tavarez*, 8th Dist. Cuyahoga No. 88310, 2007-Ohio-2643, ¶ 34 ("We have significant doubts whether the court fulfills its statutory duty to determine child support on a case-by-case as required by R.C. 3119.04(B) when it by rote extrapolates a percentage of income to determine child support."). We note that in cases such as this, where the combined income is greater than $150,000 and the support amount exceeds the guidelines, R.C. 3119.04(B) does not require the trial court to explain its decision. *Pruitt v. Pruitt*, 8th Dist. Cuyahoga No. 84335, 2005-Ohio-4424, ¶ 44 ("[T]he trial court is free to determine any amount above the guideline maximum without providing any reasons."). Nevertheless, R.C. 3119.04(B) requires that a court "consider the needs and standard of living of the children * * * and of the parents" on a "case-by-case basis" when crafting a child support order.

{¶ 52} As previously discussed, there is a significant disparity between Elia's and Laura's incomes. The court found that Elia's salary was $340,000 while Laura was unemployed and her only income was derived from spousal support. However, the court also granted Laura full custody of the children, and along with it the obligation to ensure that their needs are met. We find that the court's child support

order fails to adequately consider the needs and standard of living of the children and parents. In failing to craft a support order based on the unique facts and circumstances in this case we find the trial court abused its discretion. We sustain this assignment of error.

### D. Attorney Fees

{¶ 53} In her eighth assignment of error, Laura argues that the trial court abused its discretion because it did not include "problematic" and "duplicitous" charges when awarding her attorney fees. We disagree.

{¶ 54} In a divorce action, R.C. 3105.73(A) permits a trial court to award all or part of reasonable attorney fees if it finds the award equitable. Pursuant to R.C. 3105.73(A), "[i]n determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factor the court deems appropriate." *Zeidman v. Zeidman*, 10th Dist. Franklin No. 15AP-783, 2016-Ohio-4767, ¶ 29.

{¶ 55} The trial court found that awarding Laura $100,000 in attorney fees was reasonable. The court noted that Elia had funds at his disposal to pay fees and how on the other hand Laura was "financially disadvantaged." The court considered the conduct of both parties and their attorneys during the course of the litigation and stated that both sides bear responsibility for the more than $400,000 in costs generated. The court stated that it considered "whether all the legal services rendered were necessary and * * * the amount of time expended on such services was fully compensable."

{¶ 56} In so doing, the court declined to award Laura approximately $70,000 in requested fees for charges it deemed "problematic" and "duplicitous." It declined to award her $6,000 for assistants to "review and organize file," over $14,000 for review of email correspondence between co-counsel, over $40,000 for "duplicitous appearances" and nearly $10,000 for legal assistants to attend trial. The court stated that "Laura's attorneys focused more on the salacious details of Elia's conduct * * * and not enough time on the financial aspects of this case," noting incomplete information as to Laura's retirement account, lacking stipulations and missing exhibits that increased the cost of the litigation.

{¶ 57} Laura fails to provide any authority by which we can conclude that the trial court abused its discretion in determining Laura's entitlement to attorney fees. Based on the facts and circumstances of this case, we find that the trial court's award of attorney fees was within its discretion. We overrule this assignment of error.

### E. Sealing of Trial Record

{¶ 58} In her ninth assignment of error, Laura argues that the trial court erred by sua sponte ordering the entirety of the proceedings be filed under seal. We agree.

{¶ 59} The open courtroom is a bedrock principle of the American judicial system. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 386, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), fn. 15 ("For many centuries, both civil and criminal trials have traditionally been open to the public."). Moreover, in Ohio there is a constitutional requirement that "[a]ll courts shall be open * * *." Article I, Section 16, Ohio

Constitution. More specifically, the Rules of Superintendence provide for public access to court records. *State ex rel. Vindicator Printing Co. v. Wolff*, 132 Ohio St.3d 481, 2012-Ohio-3328, 974 N.E.2d 89, ¶ 23. There is a general presumption that "court records" are publically accessible. Sup.R. 45(A); *see also Davis v. Cincinnati Enquirer*, 164 Ohio App.3d 36, 2005-Ohio-5719, 840 N.E.2d 1150, ¶ 12 (1st Dist.) ("[A]s a general rule, courts should not order the blanket sealing of records."). "A court or clerk of court shall make a court record available by direct access * * *." Sup.R. 45(B)(1).

{¶ 60} Sup.R. 44(B) defines a "court record" as "both a case document and an administrative document * * *." A "'[c]ase document' means a document and information in a document submitted to a court or filed with a clerk of court in a judicial action or proceeding, including exhibits, pleadings, motions, orders, and judgments, and any documentation prepared by the court or clerk in the judicial action or proceeding * * *." Sup.R. 44(C)(1).[4] A "case file" is "the compendium of case documents in a judicial action or proceeding." Sup.R. 44(D).

{¶ 61} In limited circumstances a court is justified in restricting public access to a case document pursuant to Sup.R. 45(E)(2):

> A court shall restrict public access to information in a case document, or if necessary, the entire document, if it finds by clear and convincing

---

[4] Many types of documents are explicitly not "case documents" and thus not generally subject to public access. For example, and relevant to this case, health care documents, GAL reports, child custody evaluations and reports, supervised parenting time reports and financial disclosure statements regarding property and income are not "case documents." *See* Sup.R. 44(C)(2)(h).

evidence that the presumption of allowing public access is outweighed by a higher interest after considering each of the following:

(a) Whether public policy is served by restricting public access;

(b) Whether any state, federal, or common law exempts the document or information from public access;

(c) Whether factors that support restrictions of public access exist, including risk of injury to persons, individual privacy rights and interests, proprietary business information, public safety, and fairness of the adjudicatory process.

{¶ 62} Where a court is justified in restricting public access to a "case document" or information in a "case document," the court "shall use the least restrictive means available * * *" including redacting, restricting remote access, restricting public access for a period of time, using generic titles or descriptions or using initials  Sup.R. 45(E)(3).

{¶ 63} Here, the court did not identify any specific case document or specific information within a case document that should not be publically accessible, but rather addressed the case file as a whole.  It stated that "protect[ion] of the parties and their minor children" overcame the presumption of public access.  Because "[m]uch of the testimony was graphic and potentially (psychologically) harmful should it be made accessible to the public," the court found "clear and convincing evidence" that the judgment entry must be restricted from public access.

{¶ 64} The court also found that "documents marked as exhibits at trial * * * should be sealed" based on the proprietary business information contained in the documents themselves, an "Agreed Judgment Entry and Stipulated Protective Order," testimony about proprietary business information.

**{¶ 65}** The court found the presumption of public access was outweighed by "the importance of protecting the privacy rights of the individuals in this case, including two minor children, as well as the business entity and proprietary business information * * *." The court therefore ordered that "all trial exhibits, trial testimony, and the Judgment Entry of Divorce shall be filed 'under seal' and remain so pending appeal * * * or until further order of this Court."

**{¶ 66}** The trial court failed to identify any specific case document or part thereof and conduct a meaningful analysis as required by Sup.R. 45(E)(2). Moreover, by sealing the entire case file, the court failed to use the least restrictive means available as required by Sup.R. 45(E)(3). We sustain this assignment of error.

**{¶ 67}** It should only be in the rarest of circumstances that a court seals a case from public scrutiny. When a litigant brings his or her grievance before a court, that person must recognize that our system generally demands the record of its resolution be available for review.

**{¶ 68}** A divorce decree, by its very nature, can involve some of the more intimate details of a person's life. It reflects the dissolution of a personal relationship, the disentangling of financial interests and, where the parties have children, the determination of their futures. Contentious divorces, particularly where children are involved, can result in the airing of dirty laundry. That consequence alone, unfortunate though it may be, is nevertheless insufficient to

justify casting aside a foundational principle of our legal system in favor of a well-intentioned protective shroud.

**{¶ 69}** Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
**EILEEN A. GALLAGHER, JUDGE**

**EILEEN T. GALLAGHER, P.J., and**
**LARRY A. JONES, SR., J., CONCUR**